COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          SUPREME JUDICIAL COURT
                                                     FOR SUFFOLK COUNTY
                                                     No. BD-2022-0055


### IN RE: JAMES HAYES


### <u>MEMORANDUM OF DECISION</u>

This matter came before me on an Information filed by the Bar Counsel concerning the

conduct of attorney James Hayes. The Bar Counsel filed a four-count petition for discipline on

June 30, 2020, alleging that Hayes violated the Rules of Professional Conduct as follows:

> Count One: fraud on the Middlesex County Probate and Family Court and on the
> United States Bankruptcy Court for the District of Massachusetts, in violation of Mass. R.
> Prof. C. 1.2 (d); 3.1; 3.3 (a) (1) and (2); 3.4 (a) and (c); and 8.4 (a), (c), (d), and (h);[1]

> Count Two: violation of court orders in violation of Mass. R. Prof. C. 1.2 (d);
> 3.4 (a), and (c); 8.4 (a), (c), (d), and (h);

> Count Three: mishandling and misusing client funds, in violation of Mass. R.
> Prof. C. 1.2 (d); 1.5 (a); 1.15 (b), (d) (1), (d) (2), and (f) (1); 1.16 (e); 3.4 (a) and (c);
> 8.4 (a), (c), (d), and (h); and

> Count Four: additional dishonest conduct in violation of S.J.C. Rule 4.01, § 10,
> and Mass. R. Prof. C. 8.4 (c) and (h).

Hayes filed an answer on August 20, 2020. Due to Hayes's medical condition and certain

treatments he was undergoing, the hearing was continued for some time. The parties filed a

number of agreed-upon exhibits in May 2021, and an evidentiary hearing took place remotely

---

[1] In all instances, the relevant versions of the Rules of Professional Conduct are those in
effect at the time of Hayes's conduct.

before a hearing committee of the Board of Bar Overseers (board) over several days in June
2021. Hayes was represented by counsel at that hearing and throughout these proceedings. As
more fully detailed below, in a report dated December 28, 2021, the hearing committee made
numerous findings of fact, including specific credibility determinations, and concluded that Bar
Counsel had proved all of the charged violations. The hearing committee also found no factors in
mitigation and several factors in aggravation. It recommended that Hayes be disbarred.

Hayes appealed to the board. In a memorandum dated June 13, 2022, the board adopted
the committee's findings and conclusions and likewise recommended disbarment. The board's
recommendation as to the appropriate sanction was unanimous, but the members disagreed as to
the reasons. A majority of the board concluded that the reasons for disbarment included
intentional misuse of client funds with ensuing deprivation and with an intent to deprive. See
Matter of Schoepfer, 426 Mass. 183, 187 (1997). Two board members filed a concurrence
opining that Schoepfer was inapplicable, although disbarment was warranted for other reasons.

Before me now is the Information and record of proceedings filed by the Bar Counsel. I
have thoroughly reviewed the record and heard oral argument. For the reasons explained below, I
agree that Hayes should be disbarred.

Facts. "Although not binding on this court, the findings and recommendations of the
board are entitled to great weight." Matter of Brauer, 452 Mass. 56, 65-66 (2008), quoting Matter
of Fordham, 423 Mass. 481, 487 (1996), cert. denied, 519 U.S. 1149 (1997). "[S]ubsidiary facts
found by the Board and contained in its report filed with the information shall be upheld if
supported by substantial evidence, upon consideration of the record." S.J.C. Rule 4.01, § 8 (4).
"While [I] review the entire record and consider whatever detracts from the weight of the board's
conclusion, as long as there is substantial evidence, [I] do not disturb the board's finding, even if

[I] would have come to a different conclusion if considering the matter de novo." <u>Matter of Brauer</u>, 452 Mass. at 66, quoting <u>Matter of Segal</u>, 430 Mass. 359, 364 (1999). Moreover, the hearing committee is the "sole judge of the credibility of the testimony presented at the hearing." <u>Matter of Saab</u>, 406 Mass. 315, 328 (1989). The hearing committee's "credibility determinations will not be rejected unless it can be said with certainty that [a] finding was wholly inconsistent with another implicit finding." <u>Matter of Murray</u>, 455 Mass. 872, 880 (2010). The board adopted the hearing committee's findings of fact, and I find that the findings, with one minor exception, are amply supported by substantial evidence presented at the hearing.

Hayes was admitted to the bar of the Commonwealth on December 20, 1982. From January 4, 2004, through June 9, 2014, he maintained an IOLTA account at East Cambridge Savings Bank. He was the sole signatory on the IOLTA account. He also maintained two trust accounts at Citizens Bank. He was the sole signatory on those trust accounts as well.

This proceeding concerns Hayes's representation of Randal J. LaMarche, Jr. In August 2013, LaMarche won a one-million-dollar lottery prize. He opted to receive a lump sum payment of $650,000, which amounted to $455,000 after taxes. On or about August 26, 2013, LaMarche received a $455,000 check made payable to him from the Massachusetts Lottery. He immediately began spending some of his winnings. Among other things, he purchased a 2013 Dodge pickup truck, a used Corvette, and a motorcycle.

On August 29, 2013, after learning of LaMarche's good fortune, Julie Kenney, who was LaMarche's former girlfriend and the mother of his three children, filed a complaint for modification of a child support order that had been entered by the Probate and Family Court on March 31, 2010. LaMarche and Kenney had been involved since about 2003 in various proceedings in that court regarding paternity, custody, visitation, and child support relating to

their three children. The March 31, 2010 order required LaMarche to pay $80.00 per month in child support going forward, plus $270 per month toward an arrearage. Kenney's August 29 complaint for modification sought an increase in child support. Kenney also moved for the immediate entry of temporary orders that would require (a) LaMarche's creation of a trust to hold some portion of the lottery winnings for child support payments going forward, (b) the recalculation of the previously-ordered child support amount, and (c) LaMarche's payment of Kenney's legal fees. In support of that motion, Kenney claimed that LaMarche had recently won $650,000 in the lottery and had since been posting on Facebook about spending his winnings wildly. She stated a concern that, absent the entry of the requested orders, the lottery money would be diminished partially or entirely while the modification case was being litigated. On August 30, 2013, the Probate and Family Court issued a temporary order prohibiting LaMarche from "spending, transferring, assigning, pledging, or in any other way disposing of any lottery winnings he has received." In early September, LaMarche hired attorney Mary Beth Ayvazian to respond to the complaint for modification.

Around September 3, 2013, and no later than September 8, 2013, LaMarche also began consulting with Hayes about the Probate and Family Court matter and his recent lottery winnings. During his initial consultations, LaMarche told Hayes that he had won $455,000 after tax withholding and that Kenney was trying to obtain the winnings. He also shared that he suffered from mental health disorders, including bipolar and attention deficit hyperactivity disorders, that he received disability income, and that he had an eighth-grade education.

Hayes advised LaMarche to conceal his lottery winnings from Kenney by claiming a prior verbal agreement with his brother, Jason Prestia, to share the money on a 50/50 basis. No such agreement existed, a fact known to Hayes. Although Hayes denied that the idea for the

4

agreement with Prestia originated with him, claiming that Ayvazian had "signaled" that she had

drafted an affidavit to that effect, the hearing committee discredited Hayes on this point and

credited LaMarche's testimony.[2] The board did not disturb this or any other credibility

determination, and neither will I.

On or about September 8, 2013, while he was still represented by Ayvazian, LaMarche

paid Hayes $4,500 to represent him in the Probate and Family Court proceedings as well as any

matter concerning the lottery. The money was deposited in Hayes's IOLTA account.

On September 10, 2013, Hayes created a trust (the Great Summertime Trust) to hold the

lottery winnings. Prestia was the sole beneficiary, and Hayes was the trustee. Hayes advised

LaMarche that naming Prestia as beneficiary could protect the winnings (the trust's sole asset)

from being reached by Kenney. At the time he gave the advice, Hayes knew that the winnings

were subject to the August 30, 2013, order of the Probate and Family Court. He also knew there

was no agreement between LaMarche and Prestia for a 50/50 split of the lottery winnings.

On September 11, 2013, the Probate and Family Court appointed Tom Beauregard as

receiver to obtain and hold the lottery winnings. Further court orders entered against LaMarche

on that date, including that he transfer $51,435, which he had listed on his updated financial

statement, to Kenney's lawyer, that he pay $350 per week in child support, and that he sell none

---

[2] As recounted in the board's memorandum, there was ample evidence supporting the finding that Hayes, not LaMarche or Ayvazian, had the idea of claiming there was a prior agreement between LaMarche and Prestia. Hayes admitted to Bar Counsel that the beneficiary of a trust he created to hold the winnings "[h]ad to be someone other than [LaMarche] for the avoidance and protection reasons . . . LaMarche chose his brother." In addition, Hayes did not advise LaMarche to seek a court order to establish Prestia's half-ownership, which the board interpreted, as do I, as indicating a lack of confidence in any evidence to support the theory. The amount supposedly paid to Prestia, $170,000, was significantly less than half the lottery winnings, and Prestia never insisted on full payment of his "share," indicating that he did not expect to receive half the winnings. Finally, although Hayes claimed that the idea originated with an affidavit drafted by Ayvazian, no such affidavit was offered into evidence.

of his automobiles. Nevertheless, Hayes advised LaMarche to transfer title to his new Dodge truck to another trust (the Mystical Motors Leasing Trust), created in November 2013, which Hayes controlled and in which LaMarche and Prestia were each fifty percent beneficiaries. The truck was sold, and the proceeds of $29,000 were paid into the Mystical Motors Leasing Trust.[3] The hearing committee did not credit Hayes's claimed ignorance of the court order regarding LaMarche's vehicles. The hearing committee determined that Hayes advised LaMarche to transfer assets to the trust in order to conceal them from the court and from Kenney. As the hearing committee concluded, Hayes assisted LaMarche in engaging "in conduct that [Hayes] knew to be fraudulent, conduct that unlawfully obstructed [Kenney's] access to evidence and information, and knowingly assisted [LaMarche] to disobey obligations of the [Probate and] Family Court."

On or about September 16, 2013, LaMarche gave Prestia $170,000 in lottery winnings, which Prestia transferred to Hayes the same day. Hayes deposited the money into his IOLTA account and subsequently transferred $45,000 to the Mystical Motors Leasing Trust bank account. The $170,000 represented Prestia's supposed "half" of the lottery funds, although it is significantly less than half the after-tax lump sum received by LaMarche. Hayes used his IOLTA account as the bank account for the Great Summertime Trust, whose sole beneficiary was Prestia. On the date of these transactions, Hayes knew about the court orders of August 30 and September 11, which clearly prohibited these transfers, and he knew that the court had ordered all lottery winnings to be transferred to the receiver. The hearing committee did not credit Hayes's testimony that the money belonged to Prestia and so was not subject to the orders.

---

[3] Hayes used the Citizens Bank trust accounts for the Mystical Motors Leasing Trust.

Around September 19, 2013, Hayes directly inserted himself into the Probate and Family Court proceedings. He tried to convince Ayvazian to disobey court orders by refusing to turn over to the receiver or Kenney any of LaMarche's lottery winnings. At that time, LaMarche was under a court order to pay $51,435 to Kenney's lawyer. Rather than doing so, he paid the funds to Ayvazian. Thereafter, Hayes prepared a document to discharge Ayvazian from further work in the matter. LaMarche signed it, and she stopped work on the case.

On September 20, 2013, the same day he fired Ayvazian, LaMarche entered into a fee agreement with Hayes, "retroactive" to September 1. The fee agreement includes some shocking provisions, none of which Hayes explained to LaMarche, an unsophisticated client. Despite a recitation to the contrary in the agreement, the agreement was not explained to LaMarche; LaMarche was not informed that he should consult with independent counsel before agreeing to it; and he did not understand it. The agreement proclaimed in all capital letters: "THE CORE OBJECTIVE OF THIS ENGAGEMENT IS MAKING ALL OF CLIENT'S ASSETS NONFORFEITABLE. IT IS A CRISIS-DRIVEN, COLOSSAL TASK THAT MUST BE ACCOMPLISHED AT ONCE IN AN ATMOSPHERE OF CHAOS; CLIENT IS WILLING TO RELINQUISH ALL CONTROL OVER HIS ASSETS TO ATTORNEY IN ORDER TO ACCOMPLISH THE CORE OBJECTIVE." With no apparent basis in fact, the agreement stated that "[r]eceivers, repo agents, investigators and others are lined up to seize $650,000 in lottery proceeds. . . . The existing claims are in a state of crisis with imminent irreversible forfeiture looming. A court-appointed receiver is working to seize all of Client's money and property." In furtherance of this "crisis-driven" engagement, the agreement gave Hayes "sole discretion" as to which of many matters he would provide representation to LaMarche. The agreement described a "rancorous" relationship between LaMarche and Kenney and reflected the client's supposed

direction that his interests would be "best advanced through thorough and dogged opposition at every opportunity in every stage of every dispute with Ms. Kenney."

The fee agreement called for a "fixed fee," which could be adjusted in Hayes's sole discretion. There were a variety of "minimum fixed fees" as well as ranges of fixed fees, again in Hayes's sole discretion. The agreement did not permit the refund of a fee even if the task associated with the fee was not completed. Hayes had unfettered authority to "keep [LaMarche] free from incarceration," which Hayes admitted would have been a remote possibility unless LaMarche were found in contempt of court orders.

In contravention of Mass R. Prof. C. 1.15 (d) (3), the agreement gave Hayes permission to pay his legal fees and reimburse disbursements from the lottery funds even without notice to LaMarche and without his knowledge or authorization. It gave Hayes "sole discretion" regarding which legal actions to take and the fees he could charge and collect. Moreover, as part of the agreement, LaMarche waived "the enforcement of any ethical rule calling into question any and all terms" and "waive[d] arbitration."

In furtherance of the scheme to conceal the lottery winnings, the agreement explicitly proscribed any "paper trail" such as invoices, bills, and bank statements. The agreement recited that "[p]otential evidence obtainable by the Receiver concerning the location and nature of [LaMarche's] assets shall be strictly suppressed." The hearing committee found that Hayes included these provisions in order to advance the scheme to improperly conceal the winnings from the court, the receiver, and Kenney. As the hearing committee found, the fee agreement was oppressive, unfair, and unreasonable.

On the same day he signed the fee agreement, LaMarche signed a power of attorney, giving Hayes complete authority to make all financial and legal decisions for him. Consistent

with the fee agreement, the power of attorney gave Hayes sole discretion over which legal actions to take, the amount of fees to pay himself, and full control over money deposited by LaMarche or Prestia in a trust account maintained by Hayes. LaMarche did not understand the nature of the power of attorney, having never previously signed one. As the hearing committee found, the power of attorney, like the fee agreement, was oppressive, unfair, and unreasonable.

Once retained, Hayes advised LaMarche to file for bankruptcy in order to prevent enforcement of the Probate and Family Court orders. He filed a petition for chapter 13 bankruptcy protection on October 9, 2013, the day before a hearing in the Probate and Family Court. As Hayes knew, the bankruptcy was frivolous and filed in bad faith, lacking any basis in law or fact. It was done solely to take advantage of the automatic stay provided for in 11 U.S.C. § 362, so Kenney and her lawyer would not discover and obtain the lottery funds and so that LaMarche could evade the Probate and Family Court orders.[4] The petition prepared, filed, and signed by Hayes also contained numerous falsehoods, as detailed in the board's memorandum: the petition claimed that LaMarche's total assets were less than $100,000, when, at the very least, Hayes knew he held $170,000 of LaMarche's lottery winnings in his IOLTA account and that LaMarche also owned several vehicles; and it contained a list of expenses that, according to LaMarche's testimony, were simply made up. The hearing committee credited LaMarche's testimony that Hayes assisted him to make up numbers so that the amount listed would add up to $227,025, approximately half of the $455,000 that LaMarche had received. He did so to justify the false claim that LaMarche had spent the half of the lottery proceeds claimed to be his share.

_____

[4] Hayes asserts that filing a bankruptcy petition, thus invoking the automatic stay, was an "ordinary and appropriate means of protecting Mr. LaMarche's remaining property." Where there was no basis in law or fact to believe that LaMarche was in need of bankruptcy protection, and where the petition was riddled with falsehoods, it was neither ordinary nor appropriate.

The committee also discredited Hayes's testimony that LaMarche created the list of expenses on his own. Ultimately, the bankruptcy petition was dismissed, without objection.

Although LaMarche's prior counsel, Ayvazian, withdrew her appearance in the Probate and Family Court, Hayes refused to formally appear as LaMarche's attorney in those proceedings. Instead, he purported to appear as LaMarche's "proxy," assertedly as an accommodation for LaMarche's mental health issues. The hearing committee properly rejected this claim and found that Hayes refused to appear as his attorney in order to avoid the consequences of advising LaMarche to violate the court's orders. Moreover, he was participating in the violations, for example, by paying himself legal fees out of the enjoined lottery winnings. He was also concerned about the consequences of signing updated fraudulent financial statements as counsel for LaMarche. Despite not entering his appearance in the Probate and Family Court, Hayes continued to advise LaMarche and collected legal fees for the Probate and Family Court and Bankruptcy Court matters, paying himself from the lottery funds in his IOLTA account and in the Mystical Motors Leasing Trust bank account.

At a hearing on October 10, 2013, where Hayes purported to appear as LaMarche's "proxy," the Probate and Family Court judge allowed Ayvazian's motion to withdraw. In response to a motion Ayvazian filed before withdrawing, seeking clarification as to some funds held by her and others held by Prestia, the court ordered the lottery funds transferred to the receiver, including the funds that ostensibly had been transferred to Prestia. The court ordered the receiver to transfer to Kenney as child support $350 per week from the lottery funds and to pay Kenney's lawyer $1,500 in legal fees as part of an order for contempt (apparently for disobeying an order to turn over $51,435 to Kenney's lawyer). Despite the court order, Hayes advised LaMarche to continue to insist that the $170,000 in the IOLTA account belonged to

Prestia. Hayes knew this position was incorrect. In furtherance of this scheme, Hayes prepared

for LaMarche's signature a "pro se" petition for interlocutory relief to the Appeals Court,

seeking review of the Probate and Family Court orders of August 30, 2013 and September 11,

2013. That petition was denied within one week of its filing.

On January 29, 2014, LaMarche (now represented officially by attorney Stephen Lentine,

with Hayes in the background) and Kenney settled their dispute over the lottery funds. LaMarche

agreed to the payment of $350 per week in child support, which would be paid into a trust

established by Kenney's parents. The trust was to be funded from the balance of the funds held

by the receiver as well as an additional $50,000 "gifted" by Prestia from his "share" of the

winnings. The payment of $50,000 to Kenney's parents as trustees was made from Hayes's

IOLTA account, ostensibly on behalf of Prestia. After he distributed the $50,000, Hayes's

IOLTA account had a balance of $8.78. In exchange for the payments, Kenney agreed to waive

all future claims to the lottery funds. Kenney's attorney testified that he advised her to accept the

settlement based in part on Hayes's representation that LaMarche had exhausted all his winnings

other than what the receiver and Prestia held. Kenney's attorney was not aware of additional

money in Hayes's IOLTA account or the Mystical Motors Leasing Trust that supposedly

belonged to Prestia. The hearing committee determined that the $50,000 belonged to LaMarche,

not his brother. In total, Kenney received approximately $114,000 from LaMarche's lottery

winnings.

In total, throughout the course of his representation of LaMarche, Hayes held $203,500 in

trust funds. The funds consisted of $4,500 from LaMarche as an advance payment of legal fees;

$170,000 in lottery funds supposedly belonging to Prestia as beneficiary of the Great

Summertime Trust; and $29,000 from the sale of LaMarche's truck. In contravention of court

orders, of which he had actual knowledge, Hayes made several payments out of his IOLTA account. He also paid himself a total of $27,859.82 from the Mystical Motors Leasing Trust account and made payments to LaMarche and Prestia. Thereafter, between January and April 2014, Hayes paid himself on at least eight occasions from funds that were the subject of the court orders. In total, Hayes paid himself $85,959.92 for legal fees, of which he refunded about $1,750 to cause LaMarche to withdraw his first complaint to the Office of the Bar Counsel (more on this below). With one exception, Hayes did not provide LaMarche with an itemization of his services, the amount and date of withdrawals of funds, or the balance of remaining funds. At the time he made the withdrawals, Hayes knew of the Probate and Family Court orders and knew that the funds could not be transferred to anyone other than the receiver. Accordingly, the withdrawals disobeyed court orders, were fraudulent, and obstructed Kenney's access to evidence and information.

As the hearing committee found, the $85,959.92 in legal fees was clearly excessive in relation to the work performed. For example, Hayes charged LaMarche $7,000 for work on a potential HIPAA claim that he never filed. Under the parties' agreement pertaining to the potential HIPAA case, the amount of $7,000 was to be deducted from a potential contingent recovery; it was not a flat fee and Hayes was not entitled to it. Hayes also charged LaMarche $7,500 to prepare "tax plans," an amount the hearing committee found excessive in light of the simplicity of LaMarche's finances (SSDI benefits and the lottery winnings). He also charged (but did not collect) a one-third contingent fee on a straightforward tax refund that comprised the same work for which he charged the $7,500 flat fee. In other words, he double-billed. Also, the committee found that Hayes charged a clearly excessive fee for legal work he performed for LaMarche in connection with real estate purchased by the Great Summertime Trust in New

Hampshire. The committee found that "[a]t a minimum, [Hayes] double-charged [LaMarche] what was already a clearly excessive fee." Without LaMarche's knowledge, Hayes paid himself $4,700 for pursuing a lemon law claim concerning LaMarche's Dodge truck. However, Hayes did not pursue such a claim. When asked about this fee, Hayes tried to justify it by asserting that he assisted LaMarche in selling the truck. This was non-legal work for which a legal fee should not have been charged.

In the course of Bar Counsel's investigation, Hayes could not produce records that complied with the accounting rules of Mass. R. Prof. C. 1.15 and that would justify his fees. The hearing committee rejected his explanation that his records had been destroyed in multiple alleged computer failures, which in fact occurred before LaMarche retained him. Again, I will not disturb the committee's credibility determinations, particularly where they are supported by other evidence in the record, such as Hayes's strategy of not creating a paper trail of LaMarche's funds and the implausibility of what the board termed the "dog ate my homework" defense.[5] As the board noted, this conduct did not only run afoul of the accounting rules, but also was part of Hayes's overall fraud on the court and on Kenney.

In September 2014, as mentioned above, LaMarche filed a complaint with the Office of Bar Counsel. After Hayes received notice of the complaint, he caused LaMarche to withdraw it

---

[5] Hayes claimed that he provided LaMarche all his files on a compact disk on October 23, 2014. LaMarche denied receiving it, although the record contains a document purporting to be a signed receipt for the disk. In his complaint to the Bar Counsel, LaMarche stated that Hayes had him sign his name multiple times on blank paper. The hearing committee deduced that Hayes fraudulently used such a signature to fabricate the receipt. Contrary to the board's memorandum, however, LaMarche was not questioned about his allegation that he was instructed to sign blank paper and did not testify about it. Any finding that LaMarche, at Hayes's instruction, signed his name on blank paper is not supported by substantial evidence in the record. Nevertheless, the panel was entitled to credit LaMarche's testimony that, despite his signature on the receipt, he did not in fact receive the disk.

in exchange for a payment of $1,750. Hayes drafted a letter for LaMarche's signature, and Bar Counsel closed the file upon receipt in January 2015. On September 27, 2017, LaMarche requested that the file be reopened, and the investigation commenced anew. On June 30, 2020, Bar Counsel filed the instant petition for discipline.

<u>Violations</u>. Based on the foregoing facts, the hearing committee determined that Bar Counsel had proven the allegations in each of the four counts of the petition for discipline and that Hayes had violated numerous Rules of Professional Conduct as the petition charged. I fully agree with that assessment, as follows.

As to Count One, Hayes violated Rules 1.4 (b)[6] and 1.5 (b) (1)[7] when, through the use of an unfair and unreasonable fee agreement, he failed to permit LaMarche to make informed decisions about the scope of the representation and failed to communicate in writing the basis of the fee. Also as to this count, Hayes filed a bankruptcy petition in bad faith and generally used improper strategies to assist LaMarche in concealing the extent of the lottery winnings. This

---

[6] "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." All Rules of Professional Conduct quoted or referred to herein are those in effect at the time of Hayes's conduct.

[7] In relevant part, "[T]he scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing before or within a reasonable time after commencing the representation . . . . Any changes in the basis or rate of the fee or expenses shall also be communicated to the client."

violated Rules 1.2 (a),[8] 1.2 (d),[9] 3.4 (a),[10] 3.4 (c),[11] 8.4 (a),[12] 8.4 (c),[13] and 8.4 (h).[14] Filing the frivolous bankruptcy petition also specifically violated Rules 3.1[15] and 8.4 (a), (c), (d),[16] and (h). Hayes's misrepresentations about LaMarche's vehicle ownership on the bankruptcy petition and knowingly lying that LaMarche was "pro se" violated Rule 3.3 (a) (1),[17] 3.3 (a) (2),[18] and 8.4 (a), (c), and (d).

---

[8] In relevant part, "A lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law and these rules."

[9] In relevant part, "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ."

[10] "A lawyer shall not . . . unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having evidentiary value. A lawyer shall not counsel or assist another person to do any such act."

[11] "A lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."

[12] "It is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."

[13] "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[14] "It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on his or her fitness to practice law."

[15] In relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous."

[16] "It is professional misconduct for a lawyer to. . . engage in conduct that is prejudicial to the administration of justice."

[17] "A lawyer shall not knowingly . . make a false statement of material fact or law to a tribunal."

[18] In relevant part, "A lawyer shall not knowingly . . . fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client . . . ."

As to Count Two, Hayes violated court orders in order to pay himself, LaMarche, and Prestia. By violating the court orders, Hayes engaged in his own wrongful conduct and advised LaMarche to do the same, potentially depriving Kenney and the children of the support to which they were entitled. This misconduct also deprived Kenney of access to evidence and information. This misconduct violated Rules 1.2 (d), 3.4 (a) and (c), and 8.4 (a), (c), (d), and (h).

As to Count Three, Hayes intentionally misused trust funds and engaged in related misconduct such as failing to comply with the accounting rules set forth in Rule 1.15 (f) (1) (generally, requiring lawyers who hold trust property to maintain complete records for each trust account); failing to provide LaMarche with an itemized bill for services and a notice of the impending withdrawal of fees and the resulting balance, in violation of Rule 1.15 (d) (2)[19]; making misrepresentations to successor counsel and Bar Counsel, in violation of Rule 8.4 (c); and failing to provide LaMarche his file upon request, in violation of Rules 1.15 (d) (1)[20] and 1.16 (e). Also as to Count Three, Hayes intentionally misused client funds with the intent to deprive or with actual deprivation in violation of Rule 1.15 (b) (generally requiring segregation of trust property from the lawyer's own property) and 8.4 (c). As the hearing committee concluded, the clearly excessive fees charged by Hayes constituted a misuse of client funds, as

---

[19] "On or before the date on which a withdrawal from a trust account is made for the purpose of paying fees due to a lawyer, the lawyer shall deliver to the client in writing (i) an itemized bill or other accounting showing the services rendered, (ii) written notice of amount and date of the withdrawal, and (iii) a statement of the balance of the client's funds in the trust account after the withdrawal."

[20] "Upon final distribution of any trust property or upon request by the client or third person on whose behalf a lawyer holds trust property, the lawyer shall promptly render a full written accounting regarding such property."

will be explained more fully below. In addition, Hayes violated Rule 1.5 (a)[21] by charging and collecting a clearly excessive fee, for example, an excessive flat fee as well as a contingent fee for simple tax returns,[22] a fee for the lemon law claim that he did not pursue, and a fee for the HIPAA claim that he did not file. He also charged legal fees for non-legal work.

As to Count Four, Hayes improperly caused LaMarche to withdraw his first bar complaint by giving him a small refund and by drafting the withdrawal letter. This violated Rules 8.4(c) and (h) as well as S.J.C. Rule 4.01, § 10.[23]

Factors in mitigation and aggravation. The hearing committee rejected two proffered factors in mitigation: first, that Hayes had practiced law for some forty years with no prior disciplinary proceedings, and second, that LaMarche agreed to the fees he charged. I agree that neither of these factors mitigates Hayes's wrongdoing. See Matter of Zankowski, 487 Mass. 140, 152-153 (2021) ("advance consent to excessive fees is not mitigating"; "absence of prior discipline is to be expected").

The hearing committee also properly found several factors in aggravation. First, Hayes committed multiple violations of the Rules of Professional Conduct, with cumulative effects. See, e.g., Matter of Grayer, 483 Mass. 1013, 1019 (2019). See also Matter of Crossen, 450 Mass. 533, 574 (2008) ("Cumulative and wide-ranging misconduct may warrant the sanction of disbarment, even if the individual instances of unethical conduct would not warrant so severe a

---

[21] In relevant part, "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee or collect an unreasonable amount for expenses."

[22] As noted in the findings, Hayes charged both a flat fee and contingent fee for the tax work, but did not collect both.

[23] "A lawyer shall not, as a condition of settlement, compromise, or restitution, require a complainant to refrain from filing a complaint, to withdraw the complaint, or to fail to cooperate with the bar counsel."

sanction"). Second, LaMarche was a vulnerable, unsophisticated client, with only an eighth-grade education, learning disabilities, and mental health conditions. See Matter of Zak, 476 Mass. 1034, 1041 (2017). Third, Hayes's misconduct caused harm to LaMarche, who paid clearly excessive fees. See id. Fourth, and relatedly, Hayes had a selfish financial motive and engaged in his misconduct for his own personal benefit. See id. Fifth, Hayes exhibited a lack of candor toward the hearing committee by giving testimony that was intentionally false. See, e.g., Zankowski, supra at 153 ("While an attorney is entitled to defend against allegations of a petition for discipline, the hearing committee . . . may consider in aggravation any lack of candor it finds"). Sixth, Hayes failed to accept the seriousness of his misconduct, instead blaming others, and exhibited a lack of remorse. See Zak, supra.

Sanction. In considering the appropriate sanction, my review is "de novo, but tempered with substantial deference to the board's recommendation." Matter of Jackman, 444 Mass. 1013, 1013 (2005). The court's "primary concern in bar discipline cases is the effect upon, and perception of, the public and the bar, . . . and [I] must therefore consider, in reviewing the board's recommended sanction, what measure of discipline is necessary to protect the public and deter other attorneys from the same behavior." Matter of Laroche-St. Fleur, 490 Mass. 1020, 1023-1024 (2022), quoting Matter of Lupo, 447 Mass. 345, 356 (2006). I must also ensure that the sanction imposed is not "markedly disparate" from sanctions imposed in comparable cases. E.g., Matter of Gannett, 489 Mass. 1007, 1011 (2022). In consideration of Hayes's misconduct and the aggravating factors found by the hearing committee, I agree with the recommended sanction of disbarment.

First, I agree with the majority of the Board that this case falls within the rubric of Matter of Schoepfer, 426 Mass. 183 (1997). In Schoepfer, the court stated that where an attorney

misuses client funds, if the "attorney intended to deprive the client of funds, permanently or temporarily, or if the client was deprived of funds (no matter what the attorney intended), the standard discipline is disbarment or indefinite suspension." Id. at 187, citing Matter of the Discipline of an Attorney, 392 Mass. 827, 836 (1984). In some circumstances, a fee can be so excessive and fraudulent as to constitute misuse of funds within the meaning of Schoepfer, particularly "[w]here an attorney lacks a good faith belief that he has earned and is entitled to the monies." Matter of Goldstone, 445 Mass. 551, 566 (2005). In Goldstone, an attorney was disbarred because he overbilled and collected hundreds of thousands of dollars from a corporate client, withheld money from the client in violation of an agreement, and threatened to retain yet more funds to which he was not entitled. Id. The court stated that "such conduct constitutes conversion and misappropriation of funds." Id. Similarly, this case is no ordinary excessive-fee case. Hayes did not merely pad his bills, cf. Zankowski, supra (attorney billed for hundreds of hours for which no services were rendered), but preyed on a vulnerable, unsophisticated individual. He had LaMarche sign a shocking, predatory fee agreement and power of attorney, giving himself sole discretion to pay himself any amount he chose from LaMarche's lottery winnings. While it appears Hayes did do a modicum of legal work, the fees he collected were grossly excessive in light of the amount of work performed, and in at least one case (the HIPAA matter), he collected a fee for a claim he never filed. Moreover, the terms of the fee agreement prohibited any paper trail, so Hayes never provided LaMarche any bill or other document that would have made him accountable or alerted LaMarche to the amount Hayes was collecting. Although the total amount of client funds taken by Hayes was less than the amount at issue in Goldstone, the gross dishonesty was the same. As the board observed, "[t]he entire engagement was imbued with fraud and greed." Given all the circumstances found by the hearing committee,

19

Hayes misused his client's funds, with intentional deprivation ensuing. I agree with the board that this was theft. Under Schoepfer, disbarment is the presumptive sanction.

Second, even apart from Schoepfer, Hayes's wide-ranging misconduct in furtherance of a fraudulent scheme merits disbarment. Hayes knowingly violated a court order prohibiting disbursement of the lottery winnings and requiring that funds be transferred to the receiver. He engaged in a scheme to fraudulently conceal LaMarche's winnings, including by falsely claiming that half the winnings belonged to Prestia and by knowingly filing on LaMarche's behalf a bankruptcy petition that had no basis in law or fact and that contained falsehoods about LaMarche's expenses. In this way, he intentionally misled the courts, the receiver, and the mother of LaMarche's children, as well as her attorney, and deprived LaMarche's children of support. He engaged in numerous other acts of misconduct, as detailed above, all connected with this fraudulent scheme. At a minimum, such conduct would result in a multi-year suspension. See, e.g., Matter of Foley, 439 Mass. 324 (2003) (three-year suspension where lawyer assisted client in fabricating defense in criminal case). Taking into account the aggravating factors (LaMarche's vulnerability, Hayes's selfish financial motive, the cumulative effect of Hayes's multiple violations, and Hayes's lack of candor and lack of remorse) and the absence of mitigating factors, I agree with the board that disbarment would be warranted even if the Schoepfer rubric did not apply.

Third, disbarment is not a markedly disparate sanction compared to other cases in which attorneys engaged in wide-ranging, fraudulent misconduct and committed multiple violations of the Rules of Professional Conduct, even without a finding of intentional misuse of client funds under Schoepfer. As the board explained, disbarment was the sanction imposed in Matter of Zak, 476 Mass. 1034, 1036 (2017), in which the attorney "systematically extracted illegal and

excessive fees from numerous vulnerable and desperate clients with deceptive advertisements, misleading contractual arrangements, and deceptive and useless services" in connection with mortgage loan modifications and "engaged in unlawful fee-splitting to provide his partner and his employees with the financial incentive to use the machinations to enhance his personal financial interest at the expense of his clients," and in Matter of Crossen, 450 Mass. 533 (2008), in which the attorney, in an effort to discredit the judge presiding over his clients' case, orchestrated an elaborate scheme involving numerous deceptive and dishonest acts, including targeting the judge's former law clerk with a sham job interview meant to extract damaging information about the judge. Hayes's conduct was certainly as egregious as that committed by the attorneys in Zak and Crossen.

For his part, Hayes essentially argues that the evidence did not establish fraudulent behavior, and contends that in the absence of actionable fraud, his conduct merits at most a brief suspension. This argument would require me to disregard the extensive evidence in the record supporting the committee's findings as well as the many credibility determinations made by the committee. The conclusion that Hayes engaged in fraud is amply supported by the record. Moreover, I reject Hayes's suggestion that his conduct was not fraudulent because his actions were done "in plain sight." Not only does this fly in the face of the committee's findings, but it is also wrong as a matter of law. This is not a tort case in which questions of knowledge and reliance are relevant to an injured party's recovery, but a professional disciplinary proceeding in which my focus is on Hayes's conduct and character. See Matter of Hutton, 31 Mass. Att'y Disc. R. 313 (2015) (attorney violated rule 8.4 [c] by permitting suspended attorney to falsely identify himself, despite lack of detrimental reliance).

In sum, the Bar Counsel has proved that Hayes violated multiple Rules of Professional Conduct, intentionally deprived his vulnerable client of his money, and committed numerous fraudulent acts evincing callous disregard for his client, his client's children, and the legal system. Disbarment is necessary to protect the public and to deter other attorneys from similar misconduct. A judgment of disbarment shall issue.

So ordered.

<u>Serge Georges, Jr.</u>
Serge Georges, Jr.
Associate Justice

ENTERED: February 14, 2023